# UNITED STATES DISTRICT COURT
## For the EASTERN DISTRICT of WISCONSIN
### MILWAUKEE DIVISION

UNITED STATES *ex. rel.* KELLY CAMPBELL

        and

STATE OF WISCONSIN *ex. rel.*
KELLY CAMPBELL,

        Plaintiffs,

        v.

OUTREACH HEALTHCARE HOMES, INC.
d/b/a DEACONESS HOME HEALTH, INC.,

        and

LAZARUS BONILLA,

        Defendants.

**Filed *In Camera and under seal*
pursuant to 31 U.S.C. §3730(b)(2)**

COMPLAINT FOR DAMAGES &
INJUNCTIVE RELIEF
FALSE CLAIMS ACT
31 U.S.C. § 3730
FALSE CLAIMS FOR MEDICAL
ASSISTANCE ACT
WIS. STAT. § 20.931

Jury Trial Demanded

---

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
## UNDER 31 U.S.C. § 3730 AND WIS. STAT. §20.931

---

NOW COMES Kelly Campbell, Plaintiff/Relator, through her attorneys Cross Law Firm,

S.C., by Nola J. Hitchcock Cross and Noah Reinstein, and as and for the complaint against

Defendants, Outreach Healthcare Incorporated d/b/a/Deaconess Home Health, Inc. and Lazarus

Bonilla states as follows:

### I. INTRODUCTION

1.      This is an action brought on behalf of the United States of America and the State

of Wisconsin against Outreach Healthcare Homes, Inc. d/b/a/ Deaconess Home Health, Inc.

("Outreach") and Lazarus Bonilla ("Bonilla") to recover for knowingly false claims for home

healthcare submitted for payment to the United States and Wisconsin through the Center for

Medicare and Medicaid Services ("CMS") by failing to follow state and federal regulations for patient admissions, supervisory nurse visits, skilled nursing visits and patient recertifications in Outreach's personal care worker services program.

2.      Outreach, which is wholly owned by Bonilla, has been and is engaging in a scheme of fraudulent conduct by: (1) submitting statements at the time of admission that did not accurately describe the condition of the patient in order to generate more billing units; (2) submitting orders for care signed by a doctor who did not see or evaluate the condition of patients; (3) billing for supervisory visits of personal care workers that were not performed or that were conducted when the personal care worker purporting to be supervised was not present; (4) billing for skilled nursing visits that were not performed; (5) billing for skilled nursing visits that were not ordered; (6) billing for personal care worker services that were never performed; (7) billing for services that were performed prior to obtaining a doctor's order for those services; and (8) submitting fraudulent forms to recertify patients.

3.      The combined Federal and State bill for personal care services is high and rising. In 2004, the combined Federal and State governments paid $8.25 billion for these services. Just two years later, the bill had increased by 20 percent to reach $9.9 billion, and in 2010 it continued to grow, reaching to $13.1 billion.

4.      According to the Office of Inspector General (OIG) of the Department of Health & Human Services, taxpayers are footing the bill for improper Medicaid claims for personal care services. Ongoing and completed OIG work examines Medicaid's payment for these services around the country. These audits recommend that the States refund more than $61.1 million to the Federal Government and call upon the Centers for Medicare & Medicaid Services (CMS) to review an additional $30.3 million in tax dollars that are potentially unallowable.

2

5.     Plaintiff/Relator brings this action on behalf of the United States of America pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), and on behalf of the State of Wisconsin under the False Claims for Medical Assistance Act, Wis. Stat. § 20.931. This is an action for injunctive relief and to recover damages and civil penalties on behalf of the United States of America and State of Wisconsin arising from false billing claims and false representations made or caused to be made to the United States and State of Wisconsin and their agents and intermediaries in violation of the aforementioned statutes.

## II.  PARTIES

6.     Plaintiff/Relator, Kelly Campbell ("Campbell"), is a citizen of the United States of America and a resident of the County of Waukesha, State of Wisconsin, residing in Oconomowoc, Wisconsin 53066.

7.     Defendant Outreach Healthcare Homes, Inc., doing business as Deaconess Home Health Inc., is a domestic corporation, with its principal place of business located in the County of Milwaukee, State of Wisconsin at 2778 S. 35th Street, Suite 102-103 Milwaukee, Wisconsin 53215.  Outreach has entered into a Medicaid program provider agreement, which provides, as a condition to receive payment from Medicaid, that Outreach shall comply with all Federal and State laws pertinent to the Wisconsin Medicaid Program, including Medicaid's official handbooks and other publications.

8.     Defendant Lazarus Bonilla is the owner of Outreach and a resident of the County of Milwaukee, State of Wisconsin. He has financial control over the claims that Outreach submitted to Medicaid for payment.

9.     Campbell brings this action on behalf of the United States of America pursuant to 31 U.S.C. § 3730(b)(1).  The United States of America is a sovereign country whose Department of

3

Health and Human Services pays claims submitted to it by Outreach through the Medicaid program.

10.     Campbell brings this action on behalf of the State of Wisconsin pursuant to, Wis. Stat. §20.931(5).     The State pays claims submitted to it by Outreach through the Medicaid program.

### III. JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this court for actions brought pursuant to 31 U.S.C. § 3730.

12.     Jurisdiction over the Wisconsin law claims is appropriate pursuant to 28 U.S.C. §1367 and 31 U.S.C. §3732(b).

13.     The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Outreach transacts business in this district.

14.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Outreach transacts business in this district.

15.     Campbell has direct and independent knowledge, within the meaning of 31 U.S.C. §3730(e)(4)(B) of the information on which the allegations set forth in this Complaint are based.

16.     Campbell is the original source of the allegations as defined in 31 U.S.C. §3730(e)(4)(B).     Campbell has knowledge of the false statements, records, and claims that Defendants knowingly submitted to the Government as alleged herein.

17.     There has been no statutorily relevant public disclosure of the allegations or transactions in this Complaint.     Campbell is an original source under the Act even if such public disclosure were found to exist because she has direct and independent knowledge of the

4

wrongdoing alleged in this Complaint and because she voluntarily provided this information relating to such misconduct to the United States prior to initiating this *qui tam* suit.

18.     Before filing this complaint, Campbell communicated with the United States Department of Justice to provide information and notify the Department that she was intending to file this action and the nature of the claims and source of information.

19.     Campbell has submitted a disclosure statement to the Department of Justice together with the service of this Complaint on the United States Attorney General, State of Wisconsin Attorney General and the United States Attorney for the Eastern District of Wisconsin.

20.     Campbell has submitted substantially all of the information in her possession to the Department of Justice.

## IV. STATEMENT OF THE ACTION

21.     This action is brought on behalf of the State of Wisconsin and the United States of America to recover all damages, penalties and other remedies established by and pursuant to Wis. Stat. §20.931 and the False Claims Act, 31 U.S.C. §3729 *et. seq.*, and Kelly Campbell claims entitlement to a portion of any recovery obtained by the State of Wisconsin as *qui tam* Plaintiff/Relator authorized by Wis. Stat. § 20.931(11) and the FCA.

22.     Relator brings this action to impose liability upon Defendants for violations of Wis. Stat. § 20.931 and the FCA and violations of various state and federal regulations by submission of false claims for monetary reimbursement to the State of Wisconsin and United States for the provision of home health care.

## V. GENERAL FACTS

23.     Campbell is and has been since 1996 a registered nurse (R.N.), licensed first in Ohio and then in 2002 by the State of Wisconsin, license number 140798-30. Campbell is and

5

has been since 2011 an advanced practice nurse prescriber (APNP) licensed by the State of Wisconsin, license number 4687-33.

24.     From in or around May 2010 through on or about January 25, 2011, Outreach employed Campbell as its Director of Clinical Services.

25.     In the capacity of Outreach's Director of Clinical Service, Campbell's primary duty was to supervise individuals responsible for conducting admission visits, supervisory visits, and recertification visits with Outreach's clients who are Medicaid recipients allegedly requiring assistance with activities of daily living and Personal Care Worker services.  Occasionally, Campbell would perform initial assessments and recertification assessments herself.

26.     After employment with Outreach, in or around June 2011 and continuing to present, Campbell became Director of the Marquette Neighborhood Health Center where she also performs duties as a practicing APNP.

27.     Throughout the course of her employment with Marquette Neighborhood Health Center, Campbell regularly encountered patients who received Personal Care Worker services from Outreach.

28.     Soon after commencing employment with Outreach, in the course of her employment with Outreach, and continuing after her employment with Outreach, Campbell gained direct knowledge of various violations and acts of non-compliance with statutes and regulations, as described below.

29.     Outreach engaged in and is engaging in a scheme of fraudulent conduct by: (1) submitting statements at the time of admission that did not accurately describe the condition of the patient in order to generate more billing units; (2) submitting orders for care signed by a doctor who did not see or evaluate the condition of patients; (3) billing for supervisory visits of

6

Personal Care Workers that were not performed or that were conducted when the personal care worker purporting to be supervised was not present; (4) billing for skilled nursing visits that were not performed; (5) billing for skilled nursing visits that were not ordered; (6) billing for personal care worker services that were never performed; (7) billing for services that were performed prior to obtaining a doctor's order for those services; and (8) submitting fraudulent forms to recertify patients. Campbell gained direct knowledge of this scheme through first-hand knowledge during the course of her employment at Outreach and during the course of her employment with Marquette Neighborhood Health Center.

30.     Outreach has three main health care programs: 1) Home Health Care, which includes Personal Care, Skilled Medical Care, Private Duty Nursing, Intermittent Care, Therapy Services, Respite Care, Disability Support Services, Assistance with Daily Living Activities, Sitter Services, and House making/Household Management; 2) Pediatric Care, which includes Child Care, and Behavioral Health Services; and 3) Companion Care.

31.     Outreach is a home health agency that provides personal care worker services to clients through the Medicaid program. The personal care worker services division of Outreach is almost fully funded by Medicaid. Occasionally and perhaps once a year at most, Outreach has a private insurance patient.

32.     Personal Care Services are nonmedical services provided to assist with activities of daily living, such as bathing, dressing, light housework, medication management, meal preparation, and transportation. The State of Wisconsin and the United States of America, through the Medicaid program, pays agencies to provide personal care services to Medicaid recipients who have a medical necessity for such services.

7

# VI. DEFENDANTS' FRAUDULENT CONDUCT

## A. Initial Admission Visits/False PCST's

33.     Outreach's policy and practice is to submit bills for payment by the Medicare Program for initial admission visits without first obtaining physician's orders, which is a direct violation of the Medicaid requirements and renders such bills fraudulent.

34.     Medicaid requires receipt of the physician's orders before the initial admission visit is conducted.

35.     Outreach developed and at all material times has operated a marketing plan for generating new Medicaid clients. Outreach runs television advertisements and has also sets up table top displays in various low income areas to have potential patients provide their contact information for assessments. The initial contact with Outreach would be made either by a potential client, the client's physician, or someone else who knows the client. Outreach completes an intake form based upon the information from the person who contacted Outreach.

36.     Once the potential client contacts Outreach, Outreach fills out a form and requests the physician's orders from the physician. Regardless of whether the orders are received, Outreach conducts initial admission visits.

37.     In order to immediately generate revenue, Outreach makes initial admission visits, without regard to following the Medicaid requirement to have physician's orders. Outreach does not obtain physician's orders before making the admission visit to the potential client.

38.     The nurse conducting the admissions visit goes to the potential client's home and assesses the functional abilities of that client and what home health assistance is needed. Admission visits are normally billable under the Wisconsin Medicaid guidelines. However, to

8

bill for these visits, the agency must have received Physician's orders. Admission visits must be made by a Registered Nurse.

39. Outreach routinely bills Medicaid for the admission visits made prior to receiving a physician's order in accordance with and directives of Bonilla.

40. Regardless of whether a physician's order was received prior to the admission visit, Outreach has a routine policy of fabricating initial assessment data in order to make a patient's condition appear worse than it is in reality. By submitting inaccurate data, Outreach is able to receive more funds that it is entitled from Medicaid.

41. Typically, an RN completes a personal care screening tool (PCST) and that data is entered in order to determine how many units of care are allocated for a full year to a particular patient.

42. Throughout the course of her employment with Outreach, Campbell observed Outreach's owner, Bonilla, directly state to her and other Outreach staff performing PCST assessments that they were to document the patients' conditions as being worse than reality. Bonilla attended admission visits with RNs to teach them how to fraudulently assess patients, although he has no formal medical training or credentials.

43. On most occasions, R.N.s accurately completed the PCST based on the patient's condition, but that data was altered when it was entered and submitted to Medicare in order to receive payment.

44. Outreach's owner, Bonilla, would pressure the individuals performing data entry, who did not physically assess the patient, to enter data that were different from the data contained on the PCST. As a result of this practice, the number of billable units available for a patient was

9

artificially increased, and consequently Medicaid was billed for more services than were necessary.

45.    A representative example of the conduct described above is the PCST completed for patient K.L. on or around January 11, 2012. For the items "mobility in home," "toileting," and "transferring," the R.N. who performed the PCST rated K.L. at level A, which is the most independent and therefore requires the least amount of personal care worker services. However, when the data was entered and submitted for billing to Medicare, patient K.L. was rated at level C for those three categories. As a result of the fraudulent data entered, Medicare was billed for more services than necessary.

46.    Another representative example of the conduct described above is the PCST completed for patient C.J. on or around February 13, 2012. Patient C.J. was described in the PCST as needing constant supervision for feeding, moving about, transferring and grooming. However, while working as an APNP at Marquette Neighborhood Health Center, Campbell personally observed that patient C.J. was capable of performing all tasks without the need for assistance.

47.    In addition to the fraudulent conduct described above, Outreach would also submit fraudulent PCST's for the purposes of recertification. Instead of having a RN perform a new PCST, Outreach would direct its data entry personnel to submit old PCSTs with new dates and, on occasion, with a different nurse's name.

48.    Campbell learned that nearly a year after she left the employment of Outreach, her name as well as another previously-employer nurse, Jenny Flynn, were used as the RNs who had purportedly performed the PCST for a patient.

10

## B. Supervisory Visits

49.     Medicaid regulations require that supervisory visits are made while the Personal Care Worker is present. Once a client has been authorized for Personal Care Worker services, Outreach has a routine practice for making supervisory visits.

50.     Supervisory visits are made to Outreach's clients every fifty (50) to sixty (60) days.

51.     Outreach management directs a Scheduler employed by Outreach to schedule supervisory visits.

52.     For the supervisory visit, the nurse is only provided with an Outreach created Personal Care Worker Evaluation form.

53.     The supervisory visit nurse goes into the home of the client to interview the client without observation of the personal care worker providing services. The interview consists of the following questions to the client:

- is the Personal Care Worker neat and clean?

- is the Personal Care Worker prompt and regular in attendance?

- does the Personal Care Worker follow and implement the plan of care?

- does the Personal Care Worker show kindness and respect for the client's privacy, cultural origin, and property?

- is the client/family pleased with the care?

- does the Personal Care Worker report to the supervisor changes in condition and concerns of the client/family?

- has the Personal Care Worker assisted the client to be clean and well groomed?

11

54. The supervisory visit does not include observing the Personal Care Worker providing any services to the client.

55. Outreach submits bills to the Medicaid program for all incomplete supervisory visits which constitutes knowingly false billing to Medicaid for services that were never performed properly.

56. Outreach is causing patient harm by not ensuring that the Personal Care Workers are actually providing the proper services to the patients.

57. In addition to billing Medicaid for incomplete supervisory visits, Outreach also has a practice of billing for supervisory visits that were never performed.

58. As a representative example, Campbell is personally aware that between May 2010 and January 2011 R.N. Barb Freundl submitted documentation, ultimately billed and paid for by the State of Wisconsin and the United States, indicating that she performed supervisory visits of personal care workers that were never actually performed.

## C. Skilled Nursing Visits

59. While the majority of the care provided by Outreach was personal care worker services, many patients required some level of skilled nursing care. For skilled nursing care to be properly reimbursable by Medicaid, the skilled nursing care must be ordered by a physician. At least during the time period of Campbell's employment Outreach had a practice of billing for skilled nursing visits that were either not ordered or not performed.

60. As a representative example, patient L.W. was seen for skilled nursing wound care in or around June 2010 without an order for such treatment. Even though there was no order for skilled nursing wound care, Outreach billed Medicaid and received payment for the skilled nursing visits.

12

61.     Similarly, many skilled visits that should have been performed by nurses were not being performed but were billed to Medicare nonetheless. During the course of Campbell's employment with Outreach she became aware that nurses were submitting billing for visits that were never made.

### D. Personal Care Worker Visits Not Performed

62.     Throughout the course of her employment with Outreach, Campbell became aware that Outreach was submitting bills for personal care worker services that were not actually performed.

63.     On several occasions Campbell received phone calls from patients inquiring when the patient's personal care worker was scheduled to perform services because it had been several days or weeks since the personal care worker was present. Campbell then accessed the patient's records and learned that the personal care worker had been submitting bills which showed that the patient had been cared for.

### E. Orders for Care Signed by Doctor who did not see patient

64.     Outreach routinely engaged in the practice of having a doctor sign orders for home personal care services for patients who were never seen by the doctor.

65.     During Campbell's employment with Outreach, and for some period both before and thereafter, Zerovec served as Outreach's sole Medical Director. Zerovec is licensed as a Doctor of Podiatric Medicine (D.P.M.), a podiatrist, but not as a Doctor of Medicine (M.D.) or a Doctor of Osteopathic Medicine (D.O.)

66.     Campbell personally observed Zerovec sign medical orders for personal care services for numerous beneficiaries with whom Zerovec had never had contact. Campbell

13

witnessed Georgette Miller, Wisconsin Division of Quality Assurance Investigator, state to Bonilla that Zerovec is prohibited from signing orders for personal care services.

### F. Outreach did not refund for overpayments

67.     Throughout the course of her employment, Campbell informed Outreach, through owner Bonilla, of the above-referenced fraudulent conduct. After being informed of the improper conduct, Outreach took no action to rectify the fraudulent billings.

68.     During Campbell's employment with Outreach, Outreach never refunded any amount to the State of Wisconsin or the United States for the fraudulent billings described above.

69.     The United States and the State of Wisconsin have been damaged by all of the aforementioned misrepresentations and knowing failures to comply with requisite agreements and regulations in an as of yet undetermined amount. With respect to the aforementioned misrepresentations and failures to comply, Outreach knowingly made false claims to officials of the State of Wisconsin and United States for the purpose of obtaining compensation for the services they offered to their clients.

## VII. CLAIMS

### COUNT ONE
### False Claims Act U.S.C. § 3729(a)(1)(A)[1]
### KNOWING SUBMISSION OF FALSE CLAIMS FOR PAYMENT

70.     Campbell re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

71.     This is a claim by Campbell, on behalf of the United States, for treble damages and penalties under the FCA, 31 U.S.C. §3729(a)(1)(A).

72.     By virtue of fraudulent concealment, misrepresentations and submission of

---

[1] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(1).

14

non-reimbursable claims described above, Outreach and Bonilla knowingly presented, or caused to be presented false or fraudulent claims capable of influencing the government's decision to pay, for improper payment or approval of personal care worker and skilled nursing services.

73. Defendants' conduct is fraudulent because it violated several of the Medicare requirements. Wisconsin Department of Health Services, pursuant to Wis. Admin. Code DHS § 108.02 (4), promulgates regulations for the Medicaid personal care worker services program. These regulations are found in the online handbook in the Wisconsin ForwardHealth Portal.

74. The ForwardHealth Portal contains online handbooks for practitioners and serves as the interface to ForwardHealth interChange, the new Medicaid management information system for the State of Wisconsin. Through this portal, providers, managed care organizations, partners, and trading partners can electronically and securely submit, manage, and maintain health records for members under their care.

**Initial Admission Visits**

75. The online handbook sets forth several regulations for initial admission visits and physician's orders.

    A.     Topic #3708 of the online handbook for the Medicaid provider of personal service (Correcting Errors Entered into the Personal Care Screening Tool) states, "Wisconsin Medicaid will reimburse providers only for medically necessary services that are provided, **ordered by the physician**, and supported by the [plan of care]." (emphasis added).

    B.     "When submitting [prior authorization] requests for [personal care worker services], the provider is required to have first obtained physician orders

15

(verbal or written as required) for [personal care worker services] included in the [plan of care]." Topic #10577 Physician's Orders of the online handbook for the Medicaid Provider of Personal Service.

C.     "The [plan of care] is developed by an RN supervisor based on physician orders in collaboration with the member/family and is approved by the physician." Topic #2460 Prior Authorization: Plan of Care of the online handbook for the Medicaid Provider of Personal Service.

D.     "Only the activities and frequencies included in the [plan of care] and as ordered by the physician may be entered on the [personal care screening tool]." Topic #11497 Parameters for Making Selections of the online handbook for the Medicaid Provider of Personal Service states Plan of Care and Physician Orders Required for Prior Authorization.

E.     "When the Personal Care Screening Tool Allocates More Time Than Ordered by the Physician.  The provider may request only the number of units that are supported by the physician's order and the [plan of care] even if the [personal care screening tool] allocates more time than needed. For example, if the physician's order and the [plan of care] support the need to provide 56 units/week (not including travel time) and the [personal care screening tool] allocates 70 units/week, then the number of units the provider may request may not exceed 56 units/week (not including travel time) without sufficient additional documentation." Topic #3684 Prior Authorization: Personal Care Screening Tool of the online handbook for the Medicaid Provider of Personal Service.

16

**Supervisory Visits**

76.     Medicaid regulations require that supervisory visits are made while the Personal Care Worker is present. Supervision, according to Wis. Admin. Code § DHS 101.03(173), is defined as intermittent face-to-face contact between the supervisor and assistant and a regular review of the assistant's work by the supervisor.

According to Wis. Admin. Code § DHS 107.112, RN supervisory duties include the following:

- Assign Personal Care Worker to specific members giving full consideration to the member's preference for choice of Personal Care Worker.

- Assign specific tasks to the Personal Care Worker giving full consideration to the member's preference for service arrangements.

- Assure the Personal Care Worker is trained for the specific tasks the Personal Care Worker is assigned to provide to the member.

- Set standards for the assigned personal care activities.

- Review the Personal Care Worker's daily written record.

- Supervise the Personal Care Worker according to a written Plan of Care and, at least every 60 days, provide a supervisory review of the Personal Care Worker providing personal care service(s) in the member's home.

- Comply with additional requirements for prior authorized services that are specifically listed in Wis. Admin. Code. § DHS 107.11(2)(b).

17

Topic #2498 of the online handbook for the Medicaid Provider of Personal

Service Duties of Registered Nurse Supervisor.

77.    The United States, unaware of the falsity of fraudulent nature of Outreach's
claims, paid the claims.

78.    By reason of these payments, the United States has been damaged, and continues
to be damaged in a substantial amount.

## COUNT TWO
### Federal False Claims Act 31 U.S.C. §§ 3729(a)(1)(B)[2]
### KNOWING CREATION OF FALSE RECORD OR STATEMENT MATERIAL TO FALSE CLAIM

79.    Campbell re-alleges and incorporates by reference the allegations contained in
the preceding paragraphs of this complaint.

80.    This is a claim for treble damages and civil penalties under the False Claims Act,
31 U.S.C. § 3729(a)(1)(B).

81.    By virtue of the fraudulent concealment, misrepresentations and submissions of
non-reimbursable claims described above, Outreach and Bonilla knowingly made, used, or
caused to be made or used false records or statements material to a false or fraudulent claim.

82.    The United States, unaware of the falsity or fraudulent nature of the claims that
Outreach caused, paid for claims that otherwise would not have been allowed and may not have
otherwise been submitted.

83.    By reason of these payments, the United States has been damaged, and continues
to be damaged in a substantial amount.

---

[2] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of
the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(2).

18

**COUNT THREE**
**Federal False Claims Act 31 U.S.C. §3729(a)(1)(C)[3]**
**CONSPIRACY TO COMMIT VIOLATION OF FALSE CLAIMS ACT**

84.     Campbell re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

85.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

86.     By virtue of fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Outreach and Bonilla conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and/or (a)(1)(B) and/or (a)(1)(G).

87.     The United States, unaware of the falsity or fraudulent nature of the claims that Outreach caused, paid for claims that otherwise would not have been allowed and may not have otherwise been submitted.

88.     By reason of these payments the United States has been damaged, and continues to be damaged in a substantial amount.

**COUNT FOUR**
**Federal False Claims Act, 31 U.S.C. 3729(a)(1)(G)**
**KNOWING OR IMPROPER AVOIDANCE OF REPAYMENT OF**
**GOVERNMENT FUNDS**

89.     Campbell re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

90.     By their actions and inactions described above, Outreach and Bonilla have received funds for knowingly false claims and has failed to timely return such funds despite a legal obligation to do so once Outreach had knowledge of the fraudulent receipts, pursuant to the Federal False Claims Act, as amended, 31 U.S.C.§ 3729 (a)(1)(G).

---

[3] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.* 31 U.S.C. § 3730(a)(2).

19

91. By reason of these payments the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT FIVE
### Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(a)
### KNOWING SUBMISSION OF FALSE CLAIMS FOR PAYMENT

92. Campbell re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

93. This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(a).

94. By virtue of the fraudulent concealment, misrepresentations and submissions of non- reimbursable claims described above, Outreach and Bonilla knowingly presented or caused to be presented to the Wisconsin Medicaid Program false or fraudulent claims for payment or approval.

95. The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Outreach, paid for claims that otherwise would not have been allowed and may not have been otherwise submitted.

96. By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## COUNT SIX
### Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(b)
### KNOWING CREATION OF FALSE RECORD OR STATEMENT MATERIAL TO
### FALSE CLAIM

97. Campbell re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

98. This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(b).

99. By virtue of the fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Outreach and Bonilla knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement, in violation of Wis. Stat. §20.931(2)(b).

100. The State of Wisconsin, unaware of the falsity or fraudulent nature of the claims that Outreach caused, paid for claims that otherwise would not have been allowed and may not have otherwise been submitted.

101. By reason of these payments, the State of Wisconsin has been damaged, and continues to be damaged in a substantial amount.

**COUNT SEVEN**
**Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(c)**
**CONSPIRACY TO COMMIT VIOLATION OF FALSE CLAIMS ACT**

102. Campbell re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

103. This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(c).

104. Moreover by virtue of the fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Outreach and Bonilla conspired to commit violations of Wis. Stat. §20.931(2)(c).

105. The State of Wisconsin, unaware of the falsity or fraudulent nature of the claims that Outreach caused, paid for claims that otherwise would not have been allowed and may not have otherwise been submitted.

106. By reason of these payments the State of Wisconsin has been damaged, and continues to be damaged in a substantial amount.

21

**Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(h)**
**KNOWING OR IMPROPER AVOIDANCE OF REPAYMENT OF GOVERNMENT**
**FUNDS**

107. Campbell re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

108. By their actions and inactions described above, Outreach and Bonilla have received funds for knowingly false claims and has failed to timely return such funds despite a legal obligation to do so once Outreach had knowledge of the fraudulent receipts, pursuant to Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(h).

109. By reason of these payments the State of Wisconsin has been damaged, and continues to be damaged in a substantial amount.

## VIII. PRAYER FOR RELIEF

WHEREFORE, the United States is entitled to damages from Defendants in accordance with 31 U.S.C. §§ 3729-3733, as amended, and the State of Wisconsin is entitled to damages from Defendants in accordance with Wis. Stat. § 20.931 of which up to twenty-five percent (25%) should be paid to the *qui tam* Plaintiff/Relator, Kelly Campbell, and such further relief as this Court may deem appropriate or proper.

AND WHEREFORE, Plaintiff/Relator requests that judgment be entered against Defendants, ordering that:

a. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et. seq.* and Wis. Stat. § 20.931;

b. Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of $5,500 to $11,000 for each

22

violation of 31 U.S.C. § 3729 and a civil penalty of $5,000 to $10,000 for each violation of Wis. Stat. § 20.931;

c.  Plaintiff/Relators be awarded the maximum amount of Relator Award percentage allowed pursuant to 31 U.S.C. § 3730(d) and Wis. Stat. §20.931 as *qui tam* Plaintiff;

d.  Plaintiff/Relator be awarded all costs of this action, including attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d);

e.  The State of Wisconsin, United States and Plaintiff/Relator all be granted such other relief as the Court deems just and proper.

**PLEASE TAKE NOTICE THAT THE PLAINTIFF/RELATOR DEMANDS THE ABOVE ENTITLED ACTION TO BE TRIED TO A 12-PERSON JURY.**

Dated this 1st day of May, 2013.

**CROSS LAW FIRM, S.C.**
**Attorneys for Plaintiff**

By: _Nola J. Hitchcock Cross_
Nola J. Hitchcock Cross
State Bar No. 1015817
Noah Reinstein
State Bar No. 1056754

The Lawyers Building
845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax:    (414) 273-7055
njhcross@crosslawfirm.com
nreinstein@crosslawfirm.com
www.crosslawfirm.com

23